228 F.2d 528
 Leo RUBENSTEIN, d/b/a The Eagle Bottling Company, Appellant,
v.
DR. PEPPER COMPANY, a Corporation, and Oliver H. Daniel and
Charles H. Chapman, a Partnership, d/b/a B-1 Bottling
Company, Clicquot Bottling Company, Dr. Pepper Company and
Bonanza Vending Company, Appellees.
 No. 15290.
 United States Court of Appeals Eighth Circuit.
 Dec. 22, 1955.
 
 Roger T. Hurwitz, Kansas City, Mo. (B. T. Hurwitz, Kansas City, Mo., was with him on the brief), for appellant.
 Richard S. Righter, Kansas City, Mo. (Lathrop, Righter, Blackwell & Parker, Kansas City, Mo., and William M. Stapleton, Albany, Mo., were with him on the brief), for appellee Dr. Pepper Co.
 Charles B. Blackmar, Kansas City, Mo. (Blackmar, Eager, Swanson, Midgley & Jones and Henry I. Eager and Richard G. Poland, Kansas City, Mo., were with him on the brief), for appellee Charles H. Chapman.
 Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.
 GARDNER, Chief Judge.
 
 
 1
 This appeal is from a judgment in favor of defendants entered on motions for summary judgment. Appellant was plaintiff and the appellees defendants and we shall refer to them as such in this opinion. Plaintiff's second amended complaint contained three separate causes of action referred to in the record as 'Counts'. Count I of said complaint sought recovery against the corporate defendant, Dr. Pepper Company, for the breach of a contract under which plaintiff received an exclusive bottler's distributorship. Count II sought recovery against the individual defendants, Chapman and Daniel, for an alleged conspiracy to induce the Dr. Pepper Company to breach its contract with plaintiff; while Count III sought recovery against all three of the defendants for an alleged conspiracy to breach the aforementioned bottler's agreement.
 
 
 2
 While Oliver H. Daniel was joined as a defendant in the action he was not served with process and did not appear either in person or by counsel. The other defendants moved separately to dismiss Count III on the ground that said Count III failed to state a claim upon which relief could be granted each defendant stating separate reasons for his motion. The motions were granted and Count III was stricken from the second amended complaint. Thereupon the defendants filed separate answers which in effect admitted the jurisdictional allegations of the complaint, admitted the execution of the bottler's license agreement, denied that the contract had been breached by the Dr. Pepper Company and denied that they had conspired to induce the Dr. Pepper Company to breach the same. As an affirmative defense each of the answering defendants alleged that on April 4, 1952 plaintiff for valuable considerations entered into an agreement with Chapman and Daniel whereby he agreed to surrender absolutely his bottler's license agreement to the Dr. Pepper Company and all of his rights, license and franchise as a bottler of Dr. Pepper beverage and products and to deliver said license agreement physically to a representative of the Dr. Pepper Company all on or before April 19, 1952; that by said agreement plaintiff expressly released and forever discharged the Dr. Pepper Company and Chapman and Daniel from all claims and demands which he then had or might thereafter have arising out of or connected with the surrender, relinquishment or cancellation of said franchise or license; that by said agreement plaintiff in effect agreed to and did convey to Chapman and Daniel all bottles, automatic coin single flavor vending machines and all Dr. Pepper syrup, crowns and cartons in his possession on April 19, 1952 and agreed to furnish Chapman and Daniel with a list of all his Dr. Pepper customers to and including said date and agreed not to do anything intentionally which would injure the name or reputation of Dr. Pepper products; that the considerations in money provided by the agreement to be paid by Chapman and Daniel to plaintiff were duly paid pursuant to agreement and are now retained by plaintiff; and that plaintiff thereby fully released and discharged any and all purported claims stated in plaintiff's second amended complaint. Plaintiff in reply to the affirmative defense set up in the answers of the defendants alleged that at the time he signed said instrument 'purporting to be a release of the claim herein sued upon, he had no knowledge of the contents of the same on account of his weak and defective mental condition at the time of such alleged signing, and on account of said weak and defective condition, did not understand anything at all of the nature and quality of his act' of entering 'into an agreement and was not competent to enter into any legal, binding contract at the time alleged by defendant.'
 
 
 3
 In this condition of the pleadings defendants separately moved for summary judgment dismissing the complaint on the merits on the ground that no genuine issue existed as to any material fact. In support of their motions defendants submitted the deposition of plaintiff, affidavit of defendant Chapman, affidavit of defendant Daniel, affidavits of certain officers of the defendant Dr. Pepper Company and contract of settlement and release set out in their answers. Plaintiff filed no counter showing.
 
 
 4
 These affidavits submitted by defendants in support of their motions showed without dispute that plaintiff and Dr. Pepper Company had long been in controversy about plaintiff's methods and activity (or lack of activity) in handling plaintiff's territory under his license agreement and that a representative of the franchise department of Dr. Pepper Company, one Gorman Smith, was sent to Kansas City in February, 1952, to locate a new bottler because the company had definitely become dissatisfied with plaintiff's operations; that Smith had previously casually seen Chapman's place of business in Kansas City and after interviewing one or two others solely on his own initiative called Chapman, made an appointment, and went out to see him. This was the first contact or communication of any kind between the Dr. Pepper Company and Chapman or Daniel and in fact neither of them had previously known or met any of the Dr. Pepper people. Smith then asked Chapman if he would be interested in becoming the Dr. Pepper bottler at which suggestion Chapman was considerably surprised. Chapman replied that Dr. Pepper had a bottler in Kansas City who was a friend of his and that he would have nothing to do with the matter unless Rubenstein was willing to sell. Smith replied that he thought Rubenstein could be bought out and that the franchise in any event was going to be available to someone. A short time later Chapman and Daniel were asked by Mr. Smith to visit the Dr. Pepper plant at Dallas which they did and there met for the first time some of its officers. There was merely a general discussion and no agreement of any kind. Chapman was told that any negotiations should be with plaintiff. Negotiations then ensued in Kansas City between Chapman and Rubenstein with some participation by Smith and these lasted over a period of some weeks. These negotiations followed the visit of March 8, 1952, by a Mr. Dosser, a Vice President of Dr. Pepper Company, to plaintiff at which time plaintiff says he was told that his franchise was terminated and also followed notification to Chapman by Dosser that plaintiff was ready to deal with him on a sale. During these negotiations plaintiff was repeatedly told by Chapman that he had no intention of taking over the franchise and business unless plaintiff was entirely willing to sell and that it was all up to him. In much of these negotiations plaintiff was represented by counsel who not only talked with Chapman but with certain of the Dr. Pepper officials and who insisted at various times on getting more money than was proposed and in fact both plaintiff and his counsel so insisted. Plaintiff asked Chapman if he objected if plaintiff tried to get more money out of the Dr. Pepper Company and Chapman said he did not. Later plaintiff presented a typed proposal to be effective as per their previous oral agreement in case his franchise was cancelled. This Chapman signed but thereafter plaintiff continued to insist on more money before he would execute a voluntary sale agreement. Finally the written agreement of sale and settlement was prepared as a final proposal by Chapman, his counsel and the Dr. Pepper Company representatives (adding $5,000 to the original figures) and this was submitted to plaintiff and his counsel. It was finally executed on April 4, 1952, in the office of Chapman's counsel with his counsel, Mr. Chapman and the latter's counsel present. On or about April 19, 1952, plaintiff's bottler's license agreement was physically surrendered to Mr. Dosser of the Dr. Pepper Company and the contract was fully executed by the transfer of the various items of property and the payment by Chapman to plaintiff of $23,841.77 of which sum Dr. Pepper Company actually furnished the additional $5,000 and Chapman furnished the remainder. The documentary evidence supporting the motions shows that neither Chapman nor Daniel had ever known any of the Dr. Pepper Company officers or employees prior to the visit of Gorman Smith in February, 1952, that they had never communicated with any representatives of the company and that the suggestion that they take over the franchise arose wholly from the Dr. Pepper Company.
 
 
 5
 The contract by which plaintiff sold certain property used by him under his bottler's license agreement to Chapman and Daniel provided, among other things, that:
 
 
 6
 'For and in consideration of the sum of Five Thousand ($5,000.00) Dollars to be paid by Chapman and Daniel to Rubenstein, as herein provided, Reubenstein agrees to surrender absolutely on or before April 19, 1952, to Dr. Pepper Company, a corporation, his bottler's license No. 323, executed on or about March 17, 1934, and as later amended, and all of his rights, license, and franchise as a bottler of Dr. Pepper beverage and products, and to deliver said license agreement physically to a representative of Dr. Pepper Company; and for the considerations provided and expressed in this agreement Rubenstein hereby releases and forever discharges Dr. Pepper Company, a corporation, and Chapman and Daniel (and each of them) of and from any and all claims and demands of whatsoever kind or nature, which he now has or may hereafter have, arising in any way out of or connected with the surrender, relinquishment or cancellation of his aforesaid franchise or license (as referred to herein), or the termination of his relationship with said corporation.'
 
 
 7
 The total consideration paid plaintiff pursuant to this contract was $23,841.77 which sum was never at any time returned or offered to be returned to the defendants or either of them.
 
 
 8
 Bearing upon the question of plaintiff's alleged mental incompetency at the time of signing the settlement and release contract the proof showed that during the negotiations and at the time of the signing of the agreement plaintiff was represented by counsel and that he declined voluntarily to surrender his bottler's license agreement for the consideration offered and upon his insistence and that of his counsel there was added to the offer the sum of $5,000 which amount was in fact paid by Dr. Pepper Company. Plaintiff in his deposition testified, among other things, that he remembered signing a document in Mr. Eager's office and identified his own signature on the settlement agreement, that he remembered surrendering his bottler's license in Mr. Eager's office and that he remembered that Mr. Chapman had paid everything he was supposed to pay under his agreement.
 
 
 9
 The evidence produced in support of defendants' motions for summary judgment will be further developed in the course of this opinion.
 
 
 10
 In seeking reversal plaintiff contends that (1) Appellant was not required to tender back any consideration received by virtue of the so-called contract of April 4, 1952, where it was clear from appellees' conduct that tender would be refused and therefore useless; (2) Where a release is void, as where party making same is mentally incapacitated, tender back of the consideration received is not required as a condition precedent to maintain the suit, however, if such a release were considered voidable, releasor is not required to return that which in any event he is entitled to retain; (3) In sustaining appellees' motions for summary judgment the trial court deprived appellant of his day in court as to a material issue of fact; (4) It was Actionable wrong for appellees to form a conspiracy to injure appellant in his business and then carry out the purposes of the conspiracy; and (5) The portion of appellant's reply to answer of appellee Chapman should not have been stricken when said reply served to clarify new matter contained in said answer.
 
 
 11
 As the judgment appealed from was entered in a summary proceeding we shall first consider the conditions under which a summary judgment may properly be entered. Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A., does not provide for a trial but is in the nature of a preliminary proceeding to determine whether or not there is involved a genuine issue as to any material fact. The proceeding is properly invoked even though the pleadings may on their face present a factual controversy. Durasteel Co. v. Great Lakes Steel Corporation, 8 Cir., 205 F.2d 438; Hurd v. Sheffield Steel Corporation, Cir., 181 F.2d 269. The applicable rule governing these proceedings is thus stated in Durasteel Co. v. Great Lakes Steel Corporation, supra (205 F.2d 441):
 
 
 12
 'A summary judgment should not be entered unless it clearly appears that there is no genuine issue as to a material fact. Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A.; Dulansky v. Iowa-Illinois Gas & Electric Co., 8 Cir., 191 F.2d 881; Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 189 F.2d 213; Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967. There may however, be a formal issue presented by the pleadings but shown by affidavit or otherwise not to be genuine. Hurd v. Sheffield Steel Corporation, 8 Cir., 181 F.2d 269; Parmelee v. Chicago Eye Shield Co., 8 Cir., 157 F.2d 582, 168 A.L.R. 1130; Broderick Wood Products Co. v. U.S., 10 Cir., 195 F.2d 433; Dewey v. Clark, 86 U.S.App.D.C. 137, 180 F.2d 766. An issue of fact is not genuine unless it has legal probative force as to a controlling issue, 35 C.J.S., Federal Courts, § 144, p. 1205. The motion for summary judgment is not a trial of the issues but for the purpose of determining whether in fact there are any genuine issues as to material facts. If it is made clearly to appear on such a motion that even though there is an issue under the pleadings there is in fact no dispute as to the controlling material facts, then the court should enter summary judgment.'
 
 
 13
 Referring to the applicable procedure on motion for summary judgment in Hurd v. Sheffield Steel Corporation, supra, we among other things said (181 F.2d 271):
 
 
 14
 'If it appears from the pleadings, affidavits, admissions or depositions that there is no genuine issue as to any material fact and that the issue is one of law, then if the law so warrants a summary judgment should be entered. The question of the sufficiency of the evidence raises an issue of law and if, under the facts, the court would be required to direct a verdict for the moving party, then a summary judgment should be granted.'
 
 
 15
 The evidence produced in support of the motions for summary judgment is not in dispute. So far as the allegation of conspiracy is involved it appears that the individual defendants, Chapman and Daniel, never met or otherwise communicated with the Dr. Pepper Company or any of its officers until after the company had decided to make a change in its representative. That the plaintiff and the Dr. Pepper Company were to sever their relations had been definitely determined before the individual defendants knew anything about it. The allegation with reference to a conspiracy therefore raises no genuine issue as to any material fact. This finds support in the testimony of plaintiff embodied in his deposition. In the course of his testimony he was among other things interrogated and gave answers as follows:
 
 
 16
 'Q. Yes. Now, you allege in I think Count II of your petition, in substance, that Mr. Chapman and Mr. Daniels persuaded the Dr. Pepper Company to breach this franchise. What were the facts on which you base that allegation? A. Well, I think it may be the other way around, that they knew that Chapman and Daniels were extremely wealthy men and had money available to put into a cooler program in accordance with their desires or wishes. They probably said that they would do it, I don't know.
 
 
 17
 'Q. Your view is that it was Dr. Pepper who persuaded Chapman and Daniels to take over the business rather than Chapman and Daniels who persuaded Dr. Pepper to let them take it over, is that it? A. I am just drawing a conclusion, I don't know how accurate. The day Dosser came up there, he said they were ready to turn it over to them Monday morning, which was a day later.
 
 
 18
 'Q. Have you any other fact to add to the statement you have made respecting the reasons for your charge in Count II of your petition that Messrs. Chapman and Daniels persuaded the Dr. Pepper Company to breach your franchise? A. Well, there is nothing I can offer at this time, sir.
 
 
 19
 'Q. Well, do you know any other facts which you have not mentioned that bear directly on that allegation? A. I did mention the fact that they had the finances to go into the program--
 
 
 20
 'Q. Yes, but I am talking about anything else, anything that you have not yet mentioned. A. No, there is nothing I can think of at the present time, sir.
 
 
 21
 'Q. Do you have any other information, facts, something that someone told you or something that you know that you haven't testified to here that would lead you to believe that either Mr. Chapman or Mr. Daniels or Mr. Chapman and Mr. Daniels acting together caused the Dr. Pepper Company to revoke your franchise? A. I have no definite information.
 
 
 22
 'Q. Was there anything that was said to you by Mr. Chapman that would lead you to believe that? A. (Interrupting) I don't recollect that.
 
 
 23
 'Q. You don't recall him saying anything? A. No.
 
 
 24
 'Q. Of course you haven't talked to Mr. Daniels on that? A. No, I don't believe I talked to Mr. Daniels on that.
 
 
 25
 'Q. Was there anything said by anybody connected with the Dr. Pepper Company, any fact that would point out that Chapman and Daniels caused or persuaded the Dr. Pepper Company to revoke your license at any time? A. I stated that the only thing I know is that Dosser said at the time of that meeting that Daniels and Chapman were ready to go the following Monday morning. This was on a Saturday.
 
 
 26
 'Q. But there was nothing else that was said that would lead you to believe-- A. (Interrupting) Nothing that I can recollect.
 
 
 27
 'Q. Well, do you know of or have any information of any conferences that Mr. Chapman or Mr. Daniels or Mr. Chapman and Mr. Daniels had with the Dr. Pepper people prior to the time that your license was revoked? A. No, I have no definite information, that I can recollect at this time.'
 
 
 28
 Manifestly plaintiff had and knew of no testimony to sustain his allegations of his complaint that the individual defendants had conspired together or with the Dr. Pepper Company to bring about a breach of plaintiff's bottler's license contract.
 
 
 29
 It appears that the individual defendants, Chapman and Daniel, for a very substantial consideration purchased from the plaintiff the property which he had on hand for use in carrying on his business under his license agreement and in connection with this contract of sale he surrendered his bottler's license agreement and thereby terminated his contract with the Dr. Pepper Company. If this contract was a valid one it could not logically be contended that the Dr. Pepper Company had breached its contract with the plaintiff. This leads us to a consideration of the contention of plaintiff that the contract of settlement was and is a nullity. This issue is governed by the laws of Missouri. The opinion of Judge Ridge in disposing of this and other related issues is so well considered that we herewith approve and adopt it as our own. In that opinion it is said:
 
 
 30
 'In his second amended complaint, plaintiff alleges that said agreement was wrongfully breached and extinguished by the corporate defendant on March 8, 1952. By their answers to the several counts of the amended complaint, the defendants allege, among other things, that on April 4, 1952, plaintiff, for a valuable consideration, entered into an agreement with the individual defendants whereby he voluntarily agreed to surrender the aforesaid bottler's license agreement to the corporate defendant; that said franchise agreement was thereafter physically delivered by plaintiff to a representative of the corporate defendant on or about April 19, 1952; that in addition to the foregoing, by his agreement of April 4, 1952, the plaintiff did expressly release and forever discharge the corporate defendant and the individual defendants from any and all claims and demands which he then had, or might thereafter have, arising out of or connected with the surrender, relinquishment or cancellation of said franchise or license agreement; and, that by said contract the plaintiff, for a valuable consideration did convey to the individual defendants title to certain personal property previously used by plaintiff in connection with the bottling and vending of 'Dr. Pepper', together with a list of all of his 'Dr. Pepper' customers in the franchise territory; that the consideration in money provided by said contract was duly paid to plaintiff by the individual defendants in accordance with the terms thereof, and is now retained by the plaintiff.
 
 
 31
 'Plaintiff, by reply to the several answers so filed by defendants, endeavors to escape the legal effect of his contract of April 4, 1952, by alleging that at the time he signed said instrument 'purporting to be a release of the claim herein sued upon, he had no knowledge of the contents of the same on account of his weak and defective mental condition at the time of such alleged signing, and on account of said weak and defective condition, did not understand anything at all of the nature and quality of his act' of entering 'into an agreement and was not competent to enter into any legal, binding contract at the time alleged by defendant.'
 
 
 32
 'The defendants have now separately moved for summary judgment. The principal ground for the corporate defendant's motion to that end, tersely stated, is that as a matter of law and the simplest logic the plaintiff cannot maintain the instant action for breach of the above-referred-to bottler's license agreement without first rescinding the contract of April 4, 1952, and returning or tendering the consideration paid to him thereunder. Said defendants assert that so long as the contract of April 4, 1952, continues in force and effect there is no 'bottler's license agreement' remaining outstanding or legally effective between plaintiff and defendants which would sustain any cause of action for the breach thereof. In other words, defendants say that by the terms of the above contract of April 4, 1952, and the undisputed facts before the Court, plaintiff is revealed as having agreed to and actually surrendering the bottler's license agreement the breach of which is made the premise of his instant claim. Under such circumstances said defendant contends that notwithstanding the claim of mental defect asserted by plaintiff, under Missouri law plaintiff cannot maintain the claim he so asserts against it.
 
 
 33
 'The logic of the corporate defendant's contention appears to us to be legally sound and unassailable. The contract of April 4, 1952, the execution of which is conceded, by its terms clearly operated to discharge, extinguish and terminate the bottler's license agreement plaintiff had with the corporate defendant, and a surrender of that document to the corporate defendant. The actual surrender took place on April 19, 1952. Unless the provisions of the agreement of April 4, 1952, can in some way be avoided and plaintiff relieved from the obligations thereof, and surrender be made of his bottler's license agreement in accordance therewith, there was and could not be any subsisting contract between the plaintiff and the corporate defendant that could be made the premise of a claim for breach of contract as here asserted.
 
 
 34
 'Plaintiff does not deny the execution of the surrender agreement, a verified copy of which is before the Court, nor does he deny the fact that he actually surrendered his bottler's license agreement to the defendants pursuant thereto. Neither does he deny that he received the consideration called for by said contract and that the same was paid to him in cash on April 19, 1952. In his reply, plaintiff does not ask this Court to exercise any equity powers it might have to relieve him of the binding obligations of said agreement, or to declare the release and surrender agreement rescinded because of any fraud in the pactum, or because of any alleged incompetence on his part to enter into said contract; nor does he tender or offer to return any of the consideration received by him thereunder. Rather, he merely asserts that by reason of his alleged mental incapacity to contract, no binding agreement was ever formed between him and the individual defendants under which the corporate defendant could now claim any legal release, as the agreement that he entered into was void ab initio, hence he asserts he may maintain the instant action against all the defendants.
 
 
 35
 'We do not believe that under the undisputed facts and the law of the State of Missouri plaintiff can with such facility legally sustain such a position, or claim to be legally relieved of an obligation he admittedly entered into for a valuable consideration with the individual defendants. Plaintiff in his pleadings does no more than suggest a contractual incapacity on his part at the time of the execution of the agreement in question. He does not allege the other contracting party had any knowledge thereof. Assuming that plaintiff 'had no knowledge of the contents' of the contract of April 4, 1952, 'on account of his weak and defective mental condition at the time of (the) signing' thereof, the contract in question was not thereby rendered null and void under the circumstances. In Missouri, as well as the great majority of other jurisdictions, it is clear that the contractual act by one claiming to be mentally deficient, but not under guardianship, absent fraud, or knowledge of such asserted incapacity by the other contracting party, is not a void act but at most only voidable at the instance of the deficient party; and then only in accordance with certain equitable principles. Such is the consistent holding of the highest court of the State of Missouri: Cf. State (ex rel. United Mut. Ins. Ass'n) v. Shain, 349 Mo. 460, 162 S.W.2d 255; Doty v. Mumma, 305 Mo. 188, 264 S.W. 656 (34 A.L.R. 1399); Jamison v. Culligan, 151 Mo. 410, 52 S.W. 224; Blount v. Spratt, 113 Mo. 48, 20 S.W. 967. See also, Kevan v. John Hancock Mut. Life Ins. Co., D.C.Mo., 3 F.Supp. 288; Evans v. York, 95 S.W.2d 902; Brann v. Missouri State Life Ins. Co., Mo.App., 226 S.W. 48; Hill-Dodge Banking Co. v. Loomis, 140 Mo.App. 62, 63, 119 S.W. 967; Sherwood v. Clarksdale Bank, Mo.App., 155 S.W.2d 527; Kelley v. United Mut. Life Ins. Ass'n, Mo.App., 112 S.W.2d 929. Such a contractual act being only voidable under Missouri law, the party alleging contractual incapacity remains bound by his contract until he takes proper steps to avoid it or be relieved therefrom by resorting to a court of equity for the rescission thereof. Before so doing, he must first satisfy a prerequisite to the granting of any equitable relief he might be entitled to, i.e. he must place the other party in status quo by making proper tender back of all benefits he has received under the contract which he seeks to rescind. (Cf. Jamison v. Culligan, supra.) As so often recited by the Courts of Missouri, a party may not have rescission in equity where he affirms and retains the benefits of his contract and only seeks to disaffirm and avoid its obligations. Compliance with the above equitable prerequisite must under Missouri law appear on the face of the pleading by which the party seeks rescission, else equity will not even commence to assume to act, let alone grant any relief in the premises. State v. Shain, and Jamison v. Culligan, supra; Barker v. Northern Pacific R. Co. (C.C.), 65 F. 460; Och v. Missouri K. & T. Ry. Co., 130 Mo. 27, 31 S.W. 962 (36 L.R.A. 442); Reid v. St. Louis & S.F.R. Co. (Mo.), 187 S.W. 15. Because plaintiff did not before bringing this action and has not in his pleading tendered the consideration paid to him under his contract of April 4, 1952, we do not believe that he may now assert any claim against defendants for breach of contract, as here asserted, even if it be conceded that he was mentally incompetent on April 4, 1952.
 
 
 36
 'The only Missouri authority cited by plaintiff in support of his position that the contract of April 4, 1952, is void ab initio is one by an intermediate appellate court of that state, Edwards v. Morehouse Stave & Mfg. Co., Mo.App., 221 S.W. 744, 746. In that case, the Springfield Court of Appeals said: 'It is also the law that where (a) release is not merely voidable, but is void, as where the party making same is mentally incapacitated or 'not knowing what he is doing,' as defendant's instruction puts it, then he is not required to pay or tender back the consideration received as a condition precedent to maintaining the suit.' In light of the specific contrary rulings by the Supreme Court of the State of Missouri, above cited, clearly such a statement, clothed as it is in so broad language, is not the law of the State of Missouri. Reference to the authorities cited by the Court in the Edwards case, in support of said proposition, reveals them to be concerned with contracts and releases where fraud was charged in the procurement thereof, and which were held to be void because of fraud in the pactum. Under the facts involved in Edwards v. Morehouse, supra, fraud in the pactum might really be the basis for the holding of the Court in that case. Fraud in the pactum is not an issue in the case at bar, and authorities holding void contracts as a consequence thereof are in no way authority for ruling that contracts by incompetent persons are void ab initio, especially where no fraudulent act in consummation thereof is alleged or shown to be involved.
 
 
 37
 'Plaintiff also relies upon a quotation by the annotator in 134 A.L.R., page 68, as authority for his position. The statement there given, which plaintiff apparently quotes as a general rule, is expressly established as being a minority rule; the annotator having previously stated the general majority rule to be that contracts of mentally incompetents are only voidable and that, consequently, tender is required before contractual acts of such parties may be voided. Even those cases annotated in support of the minority view reveal that they deal, not with contracts voided solely for mental incompetency, but are likewise concerned with fraud in their procurement and execution of releases there considered, or where it was denied that a release agreement had ever been executed.
 
 
 38
 'Plaintiff argues in justification of his failure to make an appropriate tender by asserting that there was no consideration specifically given for the release of claims and surrender of his bottler's license agreement by the contract of April 4, 1952. Plaintiff asserts that all the proceeds received by him under that contract were in payment for specific items of personal property therein mentioned and which he agreed to convey and caused to be delivered to defendants pursuant to said contract. Under such circumstances, plaintiff asserts that he was entitled to receive the money paid to him as the purchase price for such personal property and, therefore, he was under no obligation to tender or return any part thereof to the defendants. Such position, even if good law, is clearly at variance with the written terms of the contract that he admits signing. It is expressly stated in said integration that plaintiff is to receive $5,000.00 in consideration of the surrender of his bottler's license agreement and release of all claims he then has or may thereafter have as a consequence of such surrender. Before plaintiff may make any contention that the total consideration paid to him under the contract of April 4, 1952, was in payment for specific personal property, and he can be relieved from the specific terms of release and surrender therein contained, as well as the obligation the law imposes upon him to restore the status quo as above considered, there would have to be a radical reformation of the terms and provisions of his contract. By the contract of April 4th, plaintiff was specifically paid the sum of $5,000.00 for a release of all claims he then had against the defendants, and for surrendering his bottler's license agreement to the corporate defendant. The undisputed evidence is that plaintiff personally delivered his franchise agreement to the corporate defendant for cancellation and that the same was cancelled. Until plaintiff legally avoids the obligation of his said agreement and the surrender of his bottler's license agreement, there is no valid subsisting contract between plaintiff and the corporate defendant that could be made the premise for the instant action.
 
 
 39
 'In his complaint plaintiff seeks to recover from all the defendants future damages he claims he will sustain because of the alleged breach by the corporate defendant of the bottler's license agreement. After a party has once consented to the abrogation, rescission or surrender of a license agreement, he cannot thereafter bring an action in damages for breach of the license agreement so abrogated, rescinded or surrendered. 12 Am.Jur., p. 1038, Contracts, Section 455; Restatement, Contracts, Vol. 2, Section 410. No fortifying authorities are essential to sustain the proposition that after an agreement has once been rescinded it can thereafter be revived only by mutual assent or by a decree in equity.
 
 
 40
 'Concluding as we do, that the contract the breach of which plaintiff here complains of was conclusively, effectively abrogated, rescinded and terminated prior to the institution of the instant action by consent of plaintiff, plaintiff has no cause of action for the alleged breach thereof, or for the wrongful inducement of any such breach as claimed in either count of his second amended complaint.
 
 
 41
 'Therefore, the several motions of the defendants for summary judgment are sustained and it will be the order of the Court that the instant action stand dismissed, with prejudice, for failure of the plaintiff to establish any claim against the defendants upon which any relief may be granted by the Court.'
 
 
 42
 We have carefully considered all the other contentions urged by the plaintiff and think them wholly without merit. The judgment appealed from is therefore affirmed.