540 F.2d 1304
 93 L.R.R.M. (BNA) 2013, 79 Lab.Cas. P 11,564
 KABLE PRINTING COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Local No. 245, Graphic Arts International Union, AFL-CIO,
Intervenor.
KABLE PRINTING COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Graphic Arts International Union AFL-CIO, and Graphic Arts
International Union, Local 277, Intervenors.
 Nos. 75-1852, 75-1853.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 16, 1976.
Decided Aug. 17, 1976.
 
 George P. Blake, Chicago, Ill., Kenneth C. McGuiness, Washington, D. C., for petitioner.
 Richard D. Hicks, Milwaukee, Wis., Thomas D. Allison, Chicago, Ill., for intervenor.
 Elliott Moore, Deputy Assoc. Gen. Counsel, Michael S. Winer, Roger T. Brice, N. L. R. B., Washington, D. C., for respondent.
 
 
 1
 Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and NOLAND, District Judge.*
 
 
 2
 NOLAND, District Judge.
 
 
 3
 These companion cases are before the Court on the petition of Kable Printing Company to review separate orders of the National Labor Relations Board dismissing charges asserting unfair labor practices by the individual local unions herein. In the first case (hereinafter Kable 1) the petitioner disputes the Board's finding that the economic pressure asserted by the intervening union, Local No. 245, Graphic Arts International Union, against the secondary employer, Graphicscans Corporation, was not prohibited by the secondary boycott provisions of the National Labor Relations Act because Graphicscans was an "ally" of Kable.[1] In the second case (hereinafter Kable 2), petitioner contests the Board's conclusion that the alliance between Kable and S & M Rotogravure Service, Inc., a secondary employer, insulated the intervening union, Local No. 245, Graphic Arts International Union, from charges that it likewise violated Section 8(b)(4) of the Act.
 
 
 4
 An explanation of Kable's production capabilities and the dispute which gave rise to the strike of Kable's G.A.I.U. affiliate rotogravure pressmen, Local 91-P, were set forth in Blackhawk Engraving Co. v. National Labor Relations Board, 540 F.2d 1296 (7th Cir., 1976), and need not be recounted here. The strike posed immediate contract problems for petitioner, i. e., Kable faced the loss of several major accounts unless it could find an alternative means of producing the rotogravure press work required by those customers including American Home, the customer involved in Kable 1, and Oklahoma Tire and Supply Company (OTASCO), the customer involved in Kable 2.
 
 
 5
 The Board found Kable's solution was to devise an arrangement whereby American Home placed an order for the front-end rotogravure work with Graphicscans Corporation of Schiller Park, Illinois and OTASCO likewise placed a similar order for pre-press rotogravure work with S & M Rotogravure Service Inc. of New Berlin, Wisconsin. The Board concluded that the Graphicscans-Kable relationship and the S & M-Kable relationship went beyond the neutrality demanded of secondary employers in primary labor disputes. As allies both Graphicscans and S & M were found to be subject to their respective rotogravure union's pressure to induce them not to perform Kable's struck work.
 
 
 6
 The sole issue presented on appeal of both cases herein is whether substantial evidence on the record as a whole supports the Board's dismissal of the unfair labor practice charges against the unions. For the reasons set forth hereinbelow, we hold the Board correctly found petitioner arranged alliances with Graphicscans and S & M thereby insulating the intervening unions from the secondary boycott provisions of the Act.
 
 
 7
 In Blackhawk we fully discussed the standard applied on review of National Labor Relations Board orders, the ally defense to the secondary boycott prohibitions of the Act, and a customer's right to resort to self-help without benefiting the primary employer when the latter is confronted by striking employees. To briefly review, the ally doctrine permits a union to utilize economic pressure against a neutral or secondary employer not a party to the primary labor dispute whenever the secondary has entangled himself in the vortex of the primary's labor dispute. National Woodwork Manufacturers Assn. v. National Labor Relations Board, 386 U.S. 612, 627, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Applying the classic formula derived in Douds v. Metropolitan Federation of Architects, etc., 75 F.Supp. 672 (S.D.N.Y.1948) and National Labor Relations Board v. Business Machine and Office Appliance Mechanics, etc. (Royal Typewriter ), 228 F.2d 533 (2nd Cir. 1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956), we held the ally doctrine applies (1) where the secondary employer performs work which but for the strike would have been completed by the striking employees and (2) the work assists the primary employer in avoiding the economic impact of the strike just as though the primary employer had imported strikebreakers onto his own premises. We recognized, however, that a secondary employer does not enter into an alliance with the struck primary when the impetus for the arrangement whereby the secondary performs the work comes solely from the customer of the struck primary and the otherwise struck work is not performed for the benefit of the primary employer.
 
 
 8
 Kable rests its contention that the Board erred in finding alliances with Graphicscans and S & M on two theories: First, no evidence of a direct arrangement between Kable and the two secondary employers can be found in the record; second, Kable's customers, American Home and OTASCO, resorting to self-help, engaged and paid for the services of Graphicscans and S & M respectively.
 
 
 9
 We do not agree with the petitioner. As we stated in Blackhawk, direct evidence of an arrangement between a primary and secondary employer will almost always be wanting in ally cases. Each case turns on its own facts and the Board may properly infer the existence of an alliance from indirect evidence. Who pays for the work is only one factor to be considered by the Board. Otherwise, a well-counseled struck primary could avoid the strictures of the ally doctrine through the simple ruse of customer payment for the performance of struck work.
 
 
 10
 After reviewing the evidence in both cases, which is summarized below, we conclude the Board properly found the existence of an alliance between Kable and Graphicscans in Kable 1 and between Kable and S & M in Kable 2.
 
 
 11
 In Kable 1, petitioner at the time of the strike had engaged in contract renewal negotiations with the American Home Publishing Company for the production of American Home magazine. By late June 1974, the parties had agreed in principle to a five-year contract commencing with the October 1974 issue of American Home. The entire magazine was to be rotogravure printed with Kable responsible for all services required for production.
 
 
 12
 Faced with the prospect of losing a major account due to the strike of its rotogravure pressmen, petitioner attempted to directly negotiate with Graphicscans for performance of the rotogravure work on the American Home job. Graphicscans refused the work because of the struck work clause in its collective bargaining agreement with Local 245 (G.A.I.U.).[2]
 
 
 13
 Undaunted by this setback, Kable decided to devise an arrangement whereby its customer would place the order for the rotogravure work directly with a secondary employer thereby permitting Kable to reap the financial benefits of its production contract. The existence of this scheme was confirmed by a June 14, 1974 memo from the Vice President for Industrial Relations of Kable's parent company to Kable's President:
 
 
 14
 "As you know, we are in the process of testing our right of customers to place work themselves and once we are able to get a judgment against the local union either in Chicago or Milwaukee, I believe we will be able to rather easily move in and out of the front end trade shops." (Emphasis added)
 
 
 15
 Petitioner's own statement thus belies the argument that American Home resorted to self-help when it placed the order with Graphicscans. The privilege of self-help can only be invoked by a customer who on his own real initiative seeks an alternative supplier for the struck primary's services. Blackhawk v. National Labor Relations, Board, supra, at p. 1301. A struck primary employer cannot indirectly do what the ally doctrine prohibits him from doing directly.
 
 
 16
 In early June or late July, petitioner advised American Home it could not produce the rotogravure work and requested the publisher look elsewhere for those services. In response to an inquiry from American Home, petitioner's sales representative particularly recommended Graphicscans as the front end shop that could to the job.
 
 
 17
 The evidence further shows that the President of American Home, on July 11, 1974, placed a purchase order for "rotogravure cylinders as required for the October 1974 issue of American Home and as necessary for eleven issues thereafter." The order was made even though American Home's President had never contacted Graphicscans about the job requirements and no one from American Home had ever visited Graphicscans or seen samples of their work. Furthermore, the requisition did not contain any specifications despite the fact that Graphicscans had never engraved any cylinders the size of those ordered by American Home. No reference was made to price and no reference was made to terms of performance.
 
 
 18
 When Kable wrote American Home confirming the understanding that Kable would do the job on a month-to-month basis pursuant to the terms of the proposed five year contract, the record indicates petitioner took the position that it was solely responsible for the production of the magazine. The letter stated:
 
 
 19
 "We have agreed that Kable will produce for you the October 1974 issue of American Home Magazine under the provisions of the presently proposed printing contract between us, as they shall be applicable to this single issue.
 
 
 20
 Thank you for your confidence. We are looking forward to the continued production of American Home, as arrangements can be made." (Emphasis added)
 
 
 21
 The October, November and December issues of American Home were jointly produced by Kable and Graphicscans.[3] During that time the record demonstrates Graphicscans' services were performed on cylinders owned by petitioner; the cylinders were transported at Graphicscans on petitioner's trucks; petitioner provided Graphicscans with its manufacturing schedule and specifications; petitioner forwarded to Graphicscans art work received from American Home; petitioner directed detailed type and art layout instructions and received prints directly from Graphicscans before authorizing any engraving. Finally, the evidence shows that although Graphicscans billed American Home, the invoices were forwarded to the customer via Kable. Petitioner then deducted the amount it would have charged American Home for the pre-press rotogravure work according to the proposed five year Kable-American Home agreement.
 
 
 22
 Based upon the foregoing evidence, we hold the Board correctly concluded " . . . Graphicscans, by arrangement with Kable, performed the struck work on Kable's cylinders, for Graphicscans' own pecuniary benefit and with full knowledge that by doing so it was helping Kable to avoid the impact of the strike on the remaining American Home printing and binding work."
 
 
 23
 Turning to Kable 2, the Kable-OTASCO agreement required petitioner to provide not only rotogravure cylinder services, but also the printing, binding and mailing of some 3,000,000 OTASCO catalogs quarterly. The contract between the two companies was not due to expire until January 31, 1975.
 
 
 24
 The evidence before the Board shows that prior to the strike petitioner in anticipation of the adverse effect a walk-out by Local 91-P would have on its OTASCO account, initiated discussions with the customer regarding alternative means of obtaining rotogravure processing. Petitioner's sales representative specifically stated that Kable wished to maintain its relationship with OTASCO. During these conversations Kable counseled OTASCO to consider placing the work with S & M.
 
 
 25
 On June 19, 1974, approximately one month after the strike by Local 9-P at Kable, OTASCO sent S & M a cryptic purchase order for the struck rotogravure work:
 
 
 26
 "Using publisher's furnished art, make finished rotogravure cylinders ready for production press for 28 page 2-on saleflyer catalog. Publisher will supply blank cylinders. Detailed instructions to follow." (Emphasis added)
 
 
 27
 The purchase order did not recite the price or terms of the agreement. Both items were left negotiable despite the fact that OTASCO had never before engaged S & M rotogravure services.
 
 
 28
 The evidence further shows the OTASCO job was sent to S & M and work was actually begun without OTASCO's itemized requirements. In stark contrast is petitioner's contract with the customer which distinctly spells out the rotogravure work required for the catalog. Furthermore, although OTASCO was using S & M's rotogravure process for the first time, the record is without evidence that anyone from OTASCO attempted to determine the quality of the substitute service's work.
 
 
 29
 Shortly after S & M received the purchase order OTASCO wrote Kable and requested petitioner to directly furnish S & M with the blank rotogravure cylinders for the job. In early July S & M began work on the OTASCO work order which halted on July 8, 1974, when Local 277 (G.A.I.U.) rescinded its previous commitment to do the job. Local 277 took the position that the rotogravure processing was struck work from Kable.[4] Thereafter, S & M performed no further work on the OTASCO-Kable order and OTASCO subsequently engaged another printer to produce the catalogs.[5]
 
 
 30
 In addition to the foregoing evidence, three highly significant facts reported in the record support the Board's finding that the S & M-OTASCO arrangement was not an arm's length transaction:
 
 
 31
 First, the internal memo between Kable and its parent corporation asserting petitioner's right to have its customers place struck work with secondary employers thereby permitting Kable to retain the benefits of its pre-strike contracts.
 
 
 32
 Second, the OTASCO-Kable contract called for the production of catalogs, not just front-end rotogravure processing. When the strike of Local 91-P threatened to cut off Kable from the profits attendant thereto, OTASCO was enticed to stand fast by petitioner's agreement to credit the customer for any amount charged by S & M for the struck work. Notwithstanding the fact that this pricing arrangement was never operative due to Local 277's refusal to do the job, it shows that petitioner was the real party in interest with respect to S & M's role as a substitute servicer.
 
 
 33
 Third, after Local 277 declined the Kable-OTASCO job, the customer advised the struck primary that some assurance would have to be given regarding delivery of the September catalog or the job would go to another printer. The written response of petitioner's President on July 18, 1974, confirms that OTASCO knowingly cooperated in Kable's effort to avoid the consequences of Local 91-P's strike:
 
 
 34
 "This will confirm our telephone conversation of this morning in which I told you that Kable Printing Company will assure you that we can and will produce the September book. We have identified alternative positive and cylinder sources should the next few days not produce the restraining order on the secondary boycott problem. The attorneys for both ourselves and the supplier believe that our case is sound but are still waiting to get on the Court calendar. We will see that you are kept informed of progress on this matter.
 
 
 35
 Our thanks to you and the rest of your organization for your consideration and cooperation in this very important problem for all of us." (Emphasis supplied).
 
 
 36
 When read as a whole, the record overwhelmingly supports the conclusion that the OTASCO job would not have been performed by S & M but for the strike at Kable. S & M's assistance to Kable was rendered in an attempt to permit Kable to retain the benefits of its contract with OTASCO despite the strike of Local 91-P. We hold the Board properly found S & M allied itself with Kable by knowingly performing struck work pursuant to an arrangement devised by petitioner to enable it to keep its contract with OTASCO.[6]
 
 
 37
 For the foregoing reasons, the petition for review of the Board's order heretofore entered in Kable 1 on September 17, 1975 reported at 220 NLRB 75 (1975), and the petition for review of the Board's order heretofore entered in Kable 2 on August 12, 1975 reported at 219 NLRB 171 (1975) are hereby Denied.
 
 
 38
 PELL, Circuit Judge (dissenting).
 
 
 39
 Essentially for the same reasons set forth in my dissenting opinion in Blackhawk Engraving Co. v. National Labor Relations Board, 540 F.2d 1296 (7th Cir. 1976), and without repeating those reasons herein, I respectfully dissent.
 
 
 40
 I would add, however, that in the second Kable case here under review I agree with the Administrative Law Judge who after a careful analysis of the evidence before him concluded that the ally doctrine was not applicable and that the Graphic Arts Union was engaged in prohibited secondary boycott action.
 
 
 
 *
 Judge James E. Noland of the Southern District of Indiana is sitting by designation
 
 
 [1]
 Section 8(b)(4) of the Act provides, in relevant part, that it shall be unfair labor practice for a union or its agents:
 (i) to engage in, or to induce or encourage any individual employed by any person * * * to engage in, a strike or a refusal in the course of his employment to * * * perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is: * * *
 (B) forcing or requiring any person * * * to cease doing business with any other person . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.
 
 
 [2]
 The struck work provision of the Graphicscans-Local 245 contract states in relevant part: No employee shall be required to handle any struck work from any plant struck by any local of the Graphics Arts International Union other than work customarily performed for the employer involved in the strike
 
 
 [3]
 When Local 245 realized the American Home order was struck work from Kable they declined the job. The local returned to work, however, when a temporary restraining order was issued by the United States District Court for the Northern District of Illinois. The Court's order was mooted by American Homes' decision to enter into a six-year agreement with a letter-press printer for production of the magazine
 
 
 [4]
 The struck work provision of the S & M-Local 277 contract states in relevant part: The employer agrees that it will not render production assistance to any employer, any of whose plants is struck by any local of the GAIU or the International . . . by requiring the employees covered by this agreement to handle any work farmed out directly or indirectly by such employer, other than work where the employer herein customarily has performed for the employer involved in such strike or lockout
 
 
 [5]
 An attempt to obtain a temporary restraining order compelling Local 277 to return to work pursuant to § 10(l ) National Labor Relations Act, 29 U.S.C. § 160(l ) was denied by Judge Myron Gordon of the United States District Court for the Eastern District of Wisconsin on August 13, 1974. The district court concluded " . . . the timing, conduct and relative position of the actors in this scenario all suggest that what is involved here is a legitimate contractual dispute as between Local 277 and S & M, and that to characterize the effect of the challenged conduct upon Kable as a secondary boycott is without merit." N.L.R.B. v. Local 277 (G.A.I.U.), No. 74-C-295 (E.D.Wis. August 13, 1974)
 
 
 [6]
 Having found the existence of an arrangement between Kable and the secondary employers herein, we need not consider whether an alliance may be found in the absence of any arrangement devised by the primary employer. See, Laborers Union Local 859 (Thomas S. Byrne, Inc.) v. N.L.R.B., 144 U.S.App.D.C. 318, 446 F.2d 1319 (1971)