**BLACKHAWK ENGRAVING CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Mount Morris Graphic Arts International Union, Local No. 91–P (G.A.I.U.), Intervenor.**

**No. 75–1758.**

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1976.

Decided Aug. 17, 1976.

**1298**

S. Richard Pincus, Lawrence M. Cohen, Chicago, Ill., for petitioner.

Thomas D. Allison, Chicago, Ill., for intervenor.

Elliott Moore, Deputy Assoc. Gen. Counsel, Michael S. Winer, Roger T. Brice, Attys., N. L. R. B., Washington, D.C., for respondent.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and NOLAND, District Judge.*

NOLAND, District Judge.

This case is before the Court upon the petition of Blackhawk Engraving Company for review of an order issued by the National Labor Relations Board on August 8, 1975, dismissing a complaint alleging the intervenor, Mount Morris Graphic Arts International Union, Local No. 91–P, G.A.I.U., had engaged in an unfair labor practice violating Section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B).[1]

Blackhawk Engraving Company, the secondary employer herein, is a small independently operated printing preparatory stop located in Oregon, Illinois, which performs subcontracting work for several large printing companies and also directly performs pre-press preparatory work for a number of publishing houses. Blackhawk is capable of providing a number of front-end pre-press services including the production of engravings, lithographic positives and plates for offset printing, and rotogravure preparatory work. Approximately twenty of Blackhawk's thirty employees are members of Local 91–P (the Union).

Kable Printing Company, the primary employer herein, is located in Mount Morris, Illinois. Since 1958, Kable has had an agreement with the Chicago Tribune Com-

---

* Judge James E. Noland of the Southern District of Indiana is sitting by designation.

1. Section 8(b)(4) of the Act provides, in relevant part, that it shall be an unfair labor practice for a union or its agents:
   (i)  to engage in, or to induce or encourage any individual employed by any person * * to engage in, a strike or a refusal in the course of his employment to * * * perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is: * * *
   (B)  forcing or requiring any person * * * to cease doing business with any other person . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

pany, the customer herein, to print 750,000 copies weekly of *TV–Week* magazine. The contract calls for *TV–Week* to be produced on Kable's rotogravure presses. Rotogravure printing at Kable is a highly complex process requiring the skills of several Kable employee units. Local 91–P represents the Kable rotogravure employees while pressroom and production employees are represented by other craft and trade unions at the plant.

On May 10, 1974, the rotogravure employees represented by Local 91–P struck Kable when they were unable to negotiate a new collective bargaining agreement. Other employee units at the plant, however, did not join their strike and the printing as well as the production departments remained operational. When Kable notified the Tribune that the strike precluded production of *TV–Week* according to the terms of the contract the newspaper terminated its relationship with Kable. On its own initiative, the Tribune reached an agreement with R. R. Donnelly, a Chicago-based printing house with rotogravure capabilities for the production of the May 26, June 2, June 9 and June 16 issues of *TV–Week*.

Faced with the loss of a major account, Kable set out to convince the Tribune that *TV–Week* could be printed by Kable provided the front-end rotogravure work was done by another firm. Kable specifically suggested the possibility of Blackhawk doing the preparatory work. Although the Tribune's Production Manager was initially unconvinced that such an arrangement would be feasible, the Donnelly contract was extended for one week to give Kable

additional time to demonstrate Blackhawk's ability to do the pre-press rotogravure work. Upon inspection of samples of Blackhawk's rotogravure work brought to the Tribune by Kable, the Tribune determined that the front-end shop could satisfactorily perform the pre-press work.[2] The newspaper, on June 7, 1974, issued a purchase order to Blackhawk for the *TV–Week* rotogravure positives commencing with the June 30, 1974, issue and all subsequent issues.

When Blackhawk received the Tribune's purchase order, it notified Local 91–P's Chapel Chairman of the pending work. The Union, through its Vice-President, advised Blackhawk that Local 91–P would not do the *TV–Week* job if it were to be sent back to Kable because the Union considered the rotogravure positives as struck work normally performed by brother members of Local 91–P at Kable.[3] At no time did the union members at Blackhawk refuse to do any Kable preparatory work that had been done at Blackhawk prior to the strike.

On June 20, 1974, Blackhawk filed charges with the National Labor Relations Board (the Board) against Local 91–P alleging the Union had committed an unfair labor practice by inducing Blackhawk's employees to refuse to perform the *TV–Week* preparatory work. A complaint subsequently issued against the Union by the General Counsel and the matter was set for a hearing. Eight days later the federal District Court for the Northern District of Illinois issued a Temporary Restraining Order prohibiting the Union from refusing the *TV–Week* job pending a final resolution of

---

2. In 1973 and again in 1974, Kable was unable to produce *TV–Week* because of labor disputes with the Machinists Union and the Pressman's Union. On both occasions the Tribune decided to have the magazine printed by a lithographic-offset company. Both times Blackhawk was selected to convert the rotogravure positives to lithographic offset negatives. In each instance Kable provided the technical specifications for Blackhawk's work and Kable was initially billed directly for the work.

3. Blackhawk's contract with Local 91–P contains a "struck work" provision which provides in pertinent part:

The Company agrees that it will not render production assistance to any employer, any of whose plants is struck by any Local of the Graphic Arts International Union or by the International, or where members of any such Local or the International are locked out, by requiring the employees covered by this contract to handle any work farmed out directly or indirectly by such employer, other than work which the Company herein customarily has performed for the employer involved in such strike or lockout.

the dispute by the Board. Thereafter, Blackhawk would receive technical specifications provided by Kable for preparation of the rotogravure positives. The finished product would be sent directly to Kable for production of rotogravure cylinders which would be used by Kable's non-striking pressmen to print *TV–Week*.

On August 8, 1975, the Board found Local 91–P had induced Blackhawk's employees to refuse to perform work on the *TV–Week* job, but that such conduct did not violate the Act because Blackhawk, by performing work ordinarily performed by Kable's striking employees, was an ally of Kable. The Board issued an order dismissing the complaint. *Mount Morris Graphic Arts International Union Local 91–P (G.A.I.U.) v. Blackhawk Engraving Co.*, 219 NLRB No. 169 (1975).

The sole issue before the Court on the petition for review is whether substantial evidence on the record as a whole supports the Board's finding that the Union's economic pressure against Blackhawk did not constitute an unfair labor practice by Local 91–P.

■ Upon review of a National Labor Relations Board order this court's inquiry is limited to a determination of whether substantial evidence in the record supports the Board's findings. Our decisions have been guided by recognition of the Board's special expertise in applying the general provisions of the National Labor Relations Act, 29 U.S.C. 151 *et seq.*, to the complexities of industrial life. *National Labor Relations Board v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); *Republic Aviation Corp. v. National Labor Relations Board*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *Phelps Dodge Corp. v. National Labor Relations Board*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The Supreme Court has recently affirmed the Board's "responsibility to adapt the Act to changing patterns of industrial life." *National Labor Relations Board v. Weingarten*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975). Thus, absent an abuse of the Board's wide-ranging latitude

of discretion or a misinterpretation of the law, this Court is bound by the Board's decision if it is supported by substantial evidence and we are not at liberty to substitute our judgment for that of the Board.

■ The law is well settled that Section 8(b)(4) of the Act which Blackhawk seeks to invoke herein implements "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *National Labor Relations Board v. Denver Building Trades Council*, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). Although Section 8(b)(4) prohibits a labor union from engaging in strike activity against a secondary or neutral employer not a party to a primary labor dispute, the ally doctrine is a recognized defense available to a union engaged in such activity "where the secondary employer against whom the union's pressure is directed has entangled himself in the vortex of the primary dispute." *National Woodwork Manufacturers Ass'n v. National Labor Relations Board*, 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967). The ally doctrine permits a union directed secondary boycott when a secondary employer performs work which but for the strike would have been completed by striking employees and the work assists the primary employer in avoiding the economic impact of the strike just as though the primary employer had imported strike breakers onto his own premises. *Douds v. Metropolitan Federation of Architects, etc.*, 75 F.Supp. 672 (S.C.N.Y.1948); *National Labor Relations Board v. Business Machine and Office Appliance Mechanics, etc. (Royal Typewriters)*, 228 F.2d 553 (2nd Cir. 1955), *cert. denied*, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956).

■ A well established caveat to the ally doctrine holds that a secondary employer does not become an ally by performing struck work, if the customer rather than the primary employer devises the arrangement whereby the struck work is placed in

the hands of the secondary. A customer does not have to shut down his operation because of a strike against a primary employer; he may take such independent self-help initiatives as are necessary to permit him to continue his business as nearly normal as possible without forfeiting the protection of Section 8(b)(4) of the Act. See, *United Marine Division, Local 333 Etc.* (New York Shipping Association) 107 NLRB 686 (1974); *National Labor Relations Board v. Enterprise Association of Pipefitters etc. Local 638* (Consolidated Edison) 285 F.2d 642 (2nd Cir. 1961); *Truck Drivers Union Local 413* (Patton Warehouse), 140 NLRB 1474 (1963), enf'd, 118 U.S.App.D.C. 149, 334 F.2d 539, *cert. denied,* 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186; *United Marine Division of the National Marketing Union, Local 373* (D. M. Picton & Co., Inc.) 131 NLRB 693 (1961). A secondary employer will not be considered an ally when the impetus for the arrangement by which the secondary performs the work comes solely from the customer of the primary employer and the otherwise struck work is not performed in the primary's name or for his benefit. See, Levin, " 'Wholly Unconcerned': The Scope and Meaning of the Ally Doctrine of Section 8(b)(4) of the N.L.R.A.", 119 U.Pitt.L.Rev. 283, 306, 307 (1970).

For the reasons set forth hereinbelow we hold the Board correctly found Blackhawk was an ally of Kable in the instant dispute.

■ Petitioner concedes that *TV–Week* would have been performed by Kable "but for" the strike, but contests the Board's finding that Blackhawk's performance of the struck work had the requisite strike-breaking effect upon Local 91–P at Kable. Whether a secondary employer's conduct has a strike breaking effect upon an ongoing labor dispute is a factual question which must be resolved on a case by case basis. The question turns not as petitioner suggests upon whether the customer attempted to engage in self-help, but rather upon whether the work diverted to the secondary employer assists the primary in evading the economic pressure created by the primary's striking employees.

At the time Kable lost the *TV–Week* job due to the labor dispute with Local 91–P a valuable Kable account was tranferred to a competitor. When the Tribune became convinced that the arrangement with Blackhawk would be satisfactory, Kable regained the account. The utilization of Blackhawk's employees diminished the effectiveness of the strike at Kable just as if Kable had hired strikebreakers onto its own premises to perform the pre-press rotogravure work. Blackhawk's services supplanted the work of Local 91–P at Kable and enabled the primary employer to carry on its usual operations, thereby stripping Blackhawk of the protection afforded neutrals by the secondary boycott provisions of the National Labor Relations Act.

■ Petitioner further contends the requisite "strikebreaker" analogy is inapplicable where, as here, the struck work is paid for by the customer rather than the primary. A determination of whether a secondary employer is a strikebreaker does not rest on the simple determination of who pays for the struck work. Such a test would "look at the form and remain blind to substance", *Douds v. Metropolitan Federation, supra,* at 676, and subvert the ally doctrine by permitting a primary and secondary employer to enter into a collusive agreement to have the customer pay for the struck work simply to avoid the strikebreaker label.

Petitioner's real dispute herein lies with the Board's finding that Blackhawk's performance of the struck work was the result of an arrangement orchestrated by Kable and was not the product of the Tribune's right to seek self-help. Blackhawk vigorously contends the absence of any direct evidence of an arrangement with Kable bars the Board from reaching that conclusion.

The distinction between a customer who engages in self-help when his primary supplier of services is struck and an ally who actively assists a struck primary is often a

close question of fact and must be resolved on a case by case basis.

■ We agree with the Board that when the self-help exception to the ally doctrine is raised by a customer or secondary employer, the traditional tests of the doctrine must first be satisfied, that is, the work performed by the secondary employer would not have been done "but for" the strike and the effect of the performance of the struck work by the secondary enables the primary to avoid the economic pressures of the strike. The focus of the inquiry then shifts to a determination of whether the secondary performed the work pursuant to an arrangement devised by the primary employer for his own account or whether the customer on its own real initiative sought an alternative source for the struck primary's services. In the former case an ally relationship results while in the latter case the secondary's neutrality is established through self-help.

■ Only in an exceptional case will direct evidence exist of an arrangement between a primary and its customer or a secondary employer which conclusively establishes an ally relationship. To preserve the ally doctrine's purpose of protecting employee rights through the exercise of a full panoply of economic pressure against their employer, the Board may properly infer the existence of an arrangement for the performance of struck work by indirect evidence. See, *Royal Typewriter, supra*, at 559.

■ In the instant dispute the evidence shows the Tribune, upon Kable's request, gave the primary a one week grace period to convince the newspaper that petitioner's operation was sufficiently compatible with Kable to produce a work product acceptable to the Tribune. The evidence demonstrates that the Tribune's reluctance to agree to a combined Kable-Blackhawk effort was overcome only after Kable took samples of petitioner's rotogravure work to the Tribune.

Despite the complicated technical specifications involved in pre-press rotogravure work, there is no evidence of any correspondence between the Tribune and Blackhawk regarding the Tribune's requirements for the *TV–Week* job. Kable dealt directly with petitioner on such matters. If, as petitioner contends, it is a common practice for a printer to maintain close liaison with his preparatory shop, such a relationship between a contractor and sub-contractor within the industry necessarily comes under the ally label. See, *Douds v. Metropolitan Federation, supra*, at 677.

The evidence further shows that petitioner billed Kable directly for the work performed on the first issue of *TV–Week*. Thereafter, Blackhawk billed the newspaper, but sent duplicate copies to Kable so the struck primary employer would know the precise credit the Tribune was entitled to receive for Blackhawk's services. Through this complicated billing procedure Kable did not charge the Tribune the full amount due under their contract for the *TV–Week* job, but instead granted a price reduction to reflect Blackhawk's performance of the struck work.

Petitioner concedes "that it naturally took some 'convincing' by Kable management before the Tribune agreed in its own 'economic interest' to return the printing ink to Kable." In light of the foregoing evidence we hold the Board correctly concluded that Kable's convincing of the Tribune and subsequent involvement with petitioner was an illicit arrangement orchestrated by Kable and not a resort to self-help by Blackhawk.[4] Blackhawk's participation in Kable's scheme to avoid the consequences of the strike by Local 91–P went beyond the neutrality demanded of a secondary employer, thereby making petitioner an ally in the primary's labor dispute.

---

**4.** Having found the existence of an arrangement between Kable and Blackhawk, the Court has not considered whether an alliance may be found in the absence of any arrangement devised by a primary employer. See *Laborers Union Local 859 (Thomas S. Byrne, Inc.) v. N. L. R. B.*, 144 U.S.App.D.C. 318, 446 F.2d 1319 (1971).

For the foregoing reasons, the petition for review of the Board's order entered August 8, 1975 in this cause is hereby DENIED.

PELL, Circuit Judge (dissenting).

Because of subsequent developments in the picture of the continuing controversy between Kable and the Graphic Arts Union as reflected in other litigation now pending in this court, the present case, although not technically moot, probably is largely academic insofar as the impact of this court's decision on the present parties is concerned. That being so and the case being a close one, I entertain some hesitancy in engaging in the preparation of a dissenting opinion. Nevertheless, and despite the careful draftsmanship of Judge Noland in the majority opinion, I believe it is necessary to record my disagreement with the majority opinion because it exceeds, in my opinion, the proper confines for the application of the so-called ally doctrine.

Certainly we may assume that if it had not been for the strike (the "but for" test), the engraving work would have been done by employees of Kable. That should not be per se dispositive. The plain impact of the Board order as enforced by this court is that any minimal contact by the struck supplier with a competitor who furnishes the material or services customarily supplied by the struck employer will be sufficient to link the two as allies. I do not conceive this to be the underlying rationale which caused the ally doctrine to be developed. The reason for the doctrine, as I understand it, was to prevent an arrangement, even though an indirect one, from being made by the primary supplier with another supplier to fill orders from regular customers during the time of the strike for the purpose of having a strikebreaking effect.

The Kable situation was not the ordinary one in which the struck manufacturer of gizmos arranges for someone else to cover his customers during the period of the strike with the full intention of taking on the account again itself after the cessation of the strike. Here although Kable had operated in essence an integrated business it was nevertheless one which consisted of distinct and separable steps. The first one of those was that of the pre-press work of preparing plates and similar items. The printing process was performed by different employees who although themselves members of the Pressmen's Union were willing to proceed across the picket line of the Graphic Arts Union to perform the printing work. Of necessity the items of a pre-press nature had to be keyed to the printing operation if that phase of the work was to be successful. It strikes me that the difficulties of Kable sufficiently insulating itself from contact with the replacement supplier so as to avoid the taint of being an ally under the Board standard in this case are such as to eliminate all practical possibility for a competitor in the area of pre-press preparation to engage in the work for its own benefit. Any so attempting will be subject to what amounts to an effective secondary boycott without the protection of the Act.

In this case there seems to be no real dispute that there was not an arrangement proved. The conclusion that the Board reached of an alliance must of necessity rest upon inference. While the inference-drawing by the Board must be accorded the greatest respect by the reviewing court, I do not conceive that the basis for an inference should be speculation and conjecture. I find no more here.

Accordingly, I respectfully dissent.