KABLE PRINTING COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

Graphic Arts International Union, AFL–CIO and Graphic Arts International Union, Local 277, Intervenors.

No. 76–1887.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1976.
Decided Nov. 26, 1976.

George P. Blake, Chicago, Ill., for petitioner.

Thomas D. Allison, Chicago, Ill., for intervenor.

Elliott Moore, Deputy Associate Gen. Counsel, Janet C. McCaa, William Wachter, Attys., N. L. R. B., Washington, D. C., for respondent.

Before CUMMINGS and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

TONE, Circuit Judge.

This case arises from a labor dispute that has been before us several times.[1] The contestants are Kable Printing Company and Graphic Arts International Union, AFL–CIO and its Local 91–P. All the prior cases, and this one as well, involve efforts to apply the secondary-boycott provisions of § 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), against those unions and another Graphic Arts local. The issue now presented is the applicability of the "ally" doctrine to subcontractors when a primary employer responds to a strike against one department in his operation by attempting to close down that department and to contract out as much of the work of that department as possible.

Some recapitulation of facts stated in earlier published opinions is necessary to make what follows intelligible. At the time this dispute started, Kable operated a complete, integrated printing business at Mount Morris, Illinois. Local 91–P represented the nonsupervisory employees in the rotogravure-processing department, while other employee units at the plant were represented by seven other unions. Local 91–P's members performed the "front-end" preparatory film and engraving work required to produce rotogravure cylinders for Kable's presses and the handling and maintenance of those cylinders.

---

[*] The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. *Squillacote v. Graphic Arts Int'l Union, AFL–CIO*, 540 F.2d 853, 855 (7th Cir. 1976), contains a complete list of the proceedings up to the date it was published.

Efforts by Kable to persuade the various unions in the plant to accept changes in working arrangements which Kable believed necessary for economic operation were successful with all the unions except Local 91–P. During negotiations which commenced early in 1974, Local 91–P refused to accept reductions in what Kable believed to be excessive manning requirements. No agreement having been reached when the contract expired on May 10, the Local 91–P members struck. Supervisory employees in the rotogravure-processing department and the members of the other unions remained on the job.

The rotogravure-processing department consisted of two basic divisions before the strike: film processing (production of film "positives" for use in cylinder processing) and cylinder processing. Kable succeeded in completely discontinuing its film-processing division by subcontracting to outside sources who, even before the strike, had supplied approximately two-thirds of Kable's requirements. Only the cylinder-processing division is involved in the dispute before us.

Immediately after the strike began, Kable attempted to have the struck cylinder-processing work done in Chicago and Milwaukee preparatory shops, but employees in those shops, relying on struck work clauses in their collective-bargaining contracts and on the Board's ally doctrine, refused to perform the work. Kable was unable to fill its customers' orders with the in-house work done by supervisors and other non-striking employees, and struck work subcontracted to certain nonunion printers was recalled for reasons that are irrelevant here. The next step Kable took was to make arrangements whereby its customers contracted for cylinder-processing work directly with independent "front-end" shops, including S & M Rotogravure Service, Inc., one of the secondary employers involved in the case at bar. These efforts too were unsuccessful,

because Graphic Arts International and its locals induced the employees in those shops to refuse to perform the struck work. Charges were filed with the NLRB against the unions, and complaints were issued by the General Counsel, who sought and eventually obtained federal court injunctions under § 10(l) of the Act, pending hearings on the complaints by the Board. See *Squillacote v. Graphic Arts International Union Local 277*, 513 F.2d 1017 (7th Cir. 1975); *Blackhawk Engraving Co. v. NLRB*, 540 F.2d 1296, 1299 (7th Cir. 1976); *Kable Printing Co. v. NLRB*, 540 F.2d 1304, 1307 n. 3 (7th Cir. 1976). In August 1975, the Board, finding that the arrangements between Kable's customers and the secondary employers had been "orchestrated" by Kable, held that the secondary employers were Kable's allies, and therefore the unions had not violated § 8(b)(4). This court recently sustained the Board's decisions in those cases. *Blackhawk Engraving Co. v. NLRB*, supra, 540 F.2d at 1296, and *Kable Printing Co. v. NLRB*, supra, 540 F.2d at 1304.[2]

On July 22, 1974, shortly after the customer-order litigation had commenced, Kable orally advised the union at a bargaining session that it was "phasing out" rotogravure-preparatory operations. Two days later the company advised the union in writing that it had "decided to close down its Roto Processing Department."

Prior to this announcement, Kable had discussed with S & M, which had already done work placed by Kable's customers, and the Mueller Color Plate Company, another "front-end" shop, the possibility of their taking over Kable's cylinder-processing work. The subject of Kable's termination of its rotogravure-processing department and the bearing such a termination would have on whether S & M's and Mueller's employees would work on Kable cylinders was discussed with them before and after the termination announcement. Both firms

---

2. *Blackhawk Engraving* sustained the Board's order in *Mt. Morris Graphic Arts Int'l Union, Local 91–P (Blackhawk Engraving Co.)*, 219 N.L.R.B. No. 169 (1975). *Kable Printing Co.* similarly affirmed the Board's action in two related cases: *Graphic Arts Int'l Union, Local 277 (S & M Rotogravure Service, Inc.)*, 219 N.L.R.B. No. 171 (1975), and *Local 245, Graphic Arts Int'l Union (Graphicscans Corp.)*, 220 N.L.R.B. No. 75 (1975).

wanted the Kable cylinder work if their employees would be willing to perform it.

For several months after the termination announcement Kable had supervisory and other non-striking employees do work which the striking employees had done and which, as the Administrative Law Judge in this case found, it was "unable to place with outside suppliers because the Union had successfully invoked the struck work provision of its contract, in one way or another, in those shops." The number of cylinders produced and the volume of other work done by Kable was gradually reduced as more work was subcontracted. Nevertheless, even when 10(*l*) injunctions allowed Kable to subcontract freely, it retained in its plant, and plans to retain indefinitely, certain residual work formerly done by the striking employees. This work, which seems to be required by the nature of the operation and Kable's ownership of the cylinders, includes the marking-up and correction of proofs, chroming and polishing of cylinders, cylinder maintenance, stripping of copper off used cylinders, copper plating and grinding of new cylinders, and loading and shipping of cylinders. Kable still assigns five employees to these tasks.

Soon after Kable's termination announcement, it entered into subcontracts with S & M and Mueller for cylinder-preparation work. The S & M employees refused to handle Kable's work, and a similar problem with Mueller's employees appeared immi-nent. Following the filing of charges against the International Union and Local 277, whose membership included the S & M and Mueller employees, the proceeding now before us was initiated by the issuance of complaints charging the unions with secondary-boycott activities .in violation of § 8(b)(4). An injunction under § 10(*l*), pending Board determination (earlier injunctions having been dissolved after the Board's decision of the customer-order cases in favor of the union), *Squillacote v. Graphic Arts International Union Local 277*, 388 F.Supp. 258 (E.D.Wis.1975), was affirmed by this court, 519 F.2d 1405 (1975). In the Board proceeding, where the complaints were consolidated, a decision of the Administrative Law Judge favorable to Kable was reversed by a panel of the Board, a two-member majority holding, as we said in *Squillacote v. Graphic Arts International Union, AFL–CIO*, 540 F.2d 853, 856 (7th Cir. 1976), "that the General Counsel had failed to prove that Kable permanently ceased its rotogravure-processing operations and that at least in the absence of such proof, an ally relationship existed between Kable and its suppliers, S & M and Mueller." As a result of the Board's decision, the preliminary injunction was vacated. In an unpublished order on a petition to review, we remanded to the Board because its decision on its face showed a failure to apply the correct standard of proof or to follow the Board's own procedural rules with respect to the treatment of credibility findings by an Administrative Law Judge.[3]

---

3. The Board, while at one point implying that the company's good faith intent was immaterial, repeatedly expressed doubts as to that intent, and, while stating the broad rule that one who provides substitute services cannot invoke the secondary-boycott provisions of the Act, appeared to rest its decision on the narrower ground that the company had failed to prove that the shutdown of the department was permanent and not a stratagem. In so holding, the Board judged the evidence on the "stratagem" issue by the standard of "clear and convincing proof" instead of preponderance and appeared to reject the ALJ's credibility determination without explanation. We stated the following two reasons for the remand in *Squillacote v. Graphic Arts International Union, AFL–CIO, supra*, 540 F.2d at 856:

"The first [reason] was that the Board majority sustained the 'struck-work' defense on the ground that 'the General Counsel's evidence falls far short of clear and convincing proof as to the permanency of Kable's announced closing down of rotogravure preparatory operations,' thus erroneously applying a more stringent standard of proof than the 'preponderance of the testimony taken' standard prescribed by § 10(c) of the Act, 29 U.S.C. § 160(c). The second reason was that, although the Board's practice is to reject an ALJ's credibility findings only when they are contrary to the 'clear preponderance' of the evidence, the Board ignored the ALJ's findings as to Kable's intent, which were based on the testimony of Kable officials, without making any finding of its own and without an explanation."

We directed the Board to correct these errors and also stated,

> "This remand is not intended to limit the Board's discretion to take any other action it finds proper on remand."

The Board accepted the remand, and the same three-member panel issued a supplemental decision in which the same majority adhered to its earlier holding that the ally doctrine protected the unions' conduct. It is this decision which is now before us for review. For purposes of its decision, the Board "accept[ed] as fact . . . that Kable decided to discontinue the work involved in this controversy, after efforts to persuade its striking employees to return to work failed, for valid economic reasons related to its competitive position in the industry and to profitability, and not as a bargaining stratagem to force capitulation by the Unions in their labor dispute with Kable." Nevertheless, the Board said, "the General Counsel has not proven by a preponderance of the testimony adduced that Kable's announced decision to discontinue its rotogravure-preparatory operations has resulted in a permanent cessation of these operations so as to overcome the ally defense interposed by the Respondent Unions." Kable's good-faith intention to discontinue the work involved in this controversy did not, said the Board, alter the character of that work as struck work or render unlawful the unions' economic pressure on S & M and Mueller to compel a cessation of that work.

The Board noted that S & M and Mueller were aware of the strike when they agreed to do the work, that Kable subcontracted with them "in order to meet contractual obligations imperiled by the strike," and that Kable continued in the "business of furnishing finished rotogravure work to its customers" under contracts which called for the production of the finished printing and encompassed all phases of the work, including the work in question. Thus, the Board concluded, it "can hardly be said . . . that Kable, which continues to contract for the performance of rotogravure preparatory work with customers seeking this service

and stands ready to assume the risks attendant upon failure to perform such contracts, has hired additional engravers for quality control purposes, and continues to chrome and strip cylinders and to mark up proofs, has permanently gone out of the rotogravure preparatory portion of its business." Accordingly, the Board sustained the unions' ally defense.

Other proceedings which are not before us deserve only brief mention here. After the Board's initial decision in this case, which we subsequently remanded, and the consequent vacating of the district court's § 10(*l*) injunction, S & M's and Mueller's employees again refused to handle the Kable cylinders. Kable filed new unfair labor practice charges with the Board. The General Counsel issued a new complaint making essentially the same allegations as those made in the case at bar. Another § 10(*l*) injunction was issued by the district court, and we affirmed on the ground of the limited review function of the court in a proceeding brought by the Regional Director for the issuance of an injunction under § 10(*l*). *Squillacote v. Graphic Arts International Union, AFL–CIO, supra,* 540 F.2d at 853. Upon the Board's supplemental decision in the case at bar, the district court entered an order vacating the preliminary injunction, and we declined to disturb that order. We are not aware that the underlying Board proceeding in the later case has been finally determined by the Board. As we noted in *Squillacote,* the General Counsel moved to consolidate the two cases before the Board. Apparently that motion was not granted, because we find no reference in the record now before us to the later case.

I

■ The Supreme Court has recently reemphasized the limited nature of our review in cases such as this and the deference due the Board's construction of the Act. *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266–267, 95 S.Ct. 959, 961, 43 L.Ed.2d 171 (1975). The Board, we are reminded, has the "special function of applying the gener-

al provisions of the Act to the complexities of industrial life." *Id.*, quoting from *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). See also *Blackhawk Engraving Co. v. NLRB, supra*, 540 F.2d at 1300.

█ We were not unmindful of this principle when we earlier remanded this case to the Board or when we held § 10(*l*) injunctions appropriate in related cases. The remand left the Board free to apply the legal principles it believed correct after resolving the facts in accordance with the proper standards. In the § 10(*l*) cases, both the district court and this court were required not only to assume the facts in favor of the charges but to permit relief if the legal theory on which the Regional Director proceeded was substantial and not frivolous. *Squillacote v. Graphic Arts International Union, AFL–CIO, supra*, 540 F.2d at 858. We determined that this test was met, but we did not determine, nor were we free to consider, the merits of the charges. Accordingly, nothing in these earlier cases controls our decision here.

## II

█ The ally gloss on § 8(b)(4) excludes from the coverage of that section boycotts aimed at secondary employers who have made themselves allies of the primary employer. The doctrine, first declared by Judge Rifkind in *Douds v. Metropolitan Federation of Architects, Etc.*, 75 F.Supp. 672 (S.D.N.Y.1948), adopted by the Second Circuit in *NLRB v. Business Machine & Office Appliance Mechanics, Etc.*, 228 F.2d 553 (1955), *cert. denied*, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956), and recognized by the Supreme Court in *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 627, 87 S.Ct. 1250, 18

L.Ed.2d 357 (1967), was discussed and applied by this court in the recent *Blackhawk Engraving Co. v. NLRB, supra*, 540 F.2d at 1300–1301.[4] In the *Blackhawk* case we applied it to secondary employers, including S & M, who accepted struck work directly from customers of Kable, the primary employer, under arrangements found by the Board to have been "orchestrated" by Kable.[5] The question before us now is whether the doctrine continues to protect the unions' secondary activity after the primary employer has attempted to terminate permanently a struck department in its integrated operation but continues to do a small part of that work itself, subcontracting the rest to others in order to continue supplying the same finished product to its customers.

## III

Kable argues that the ally defense is not available when the primary employer, for economic reasons and not as a stratagem to defeat the strike, has permanently ceased doing the work previously done by the striking employees and has subcontracted that work to others. Pointing to the ALJ's statement that its decision to take this action effectively ended the strike, Kable argues that there is lacking "the essential predicate for [the ally] defense, *i. e.*, that the work which the Unions interdicted at S & M and Mueller was work which, but for the strike, would have been done by the striking Kable employees."

█ The ALJ's statement that the termination decision effectively ended the strike was not a finding of fact but a legal conclusion, which the Board could properly set aside if it was inconsistent with the facts in the record. We think the Board was correct in determining that the strike

---

4. A comprehensive discussion of the ally doctrine and its permutations and implications appears in Levin, *"Wholly Unconcerned": The Scope and Meaning of the Ally Doctrine Under Section 8(b)(4) of the NLRA*, 119 U.Pa.L.Rev. 283 (1970); see also Irving, *The Struck Work Ally Doctrine: Some Issues and Answers*, 9 Ga.L.Rev. 303, 310–311 (1975).

5. In *Blackhawk* and the related cases (see note 2, *supra*), the challenged union activity had occurred before Kable announced the termination of its rotogravure-processing operations. There was therefore no question that the work being done on Kable cylinders by Blackhawk, S & M, and Graphicscans was work which, but for the strike, would have been done by the striking Kable workers.

and the labor dispute survived the termination decision. During the period August to October, 1974, when the acts complained of were done, Kable still continued to perform some of the work formerly done by the striking employees. To a great extent this was made necessary by the unions' secondary activities. Yet there were, as we have seen, residual portions of the struck work which Kable continued to perform, and intends to perform indefinitely, apparently because it is required to do so by the nature of its operation. Whatever the reason for Kable's failure to implement its decision to terminate the rotogravure phase of its operation, it clearly did not succeed in doing so, and thus there was still a labor dispute as to that work between Kable and striking employees and their union.

■ Nor do we think the Board rendered an impermissible construction of the Act, see *NLRB v. J. Weingarten, Inc., supra,* 420 U.S. at 266–267, 95 S.Ct. 959, 43 L.Ed.2d 171, when it rejected Kable's argument that the ally doctrine cannot apply if the work being done by the secondary employers is not "struck work" because the primary employer does not intend to do the work again at any time in the future. Admittedly, the ally doctrine was developed in cases in which there was struck work in the sense in which Kable uses that term, *i. e.,* in cases in which the primary employer expected to resume doing the work after the strike. But the rationale of those cases supports the Board's decision here: The purpose of § 8(b)(4) is to protect secondary employers who are neutral, not those who knowingly assist the primary employer in connection with the labor dispute.[6] *Douds v. Metropolitan Federation of Architects, Etc., supra,* 75 F.Supp. at 676; *NLRB v. Business Machine & Office Appliance Mechanics, Etc., supra,* 228 F.2d at 558; see *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 627–628, 87 S.Ct. 1250, 18 L.Ed.2d 357; *cf.* also *Carpet, Linoleum, Soft Tile & Resilient Floor Covering Layers,*

*Local 419 v. NLRB,* 139 U.S.App.D.C. 68, 429 F.2d 747, 753–754 (1970) (which suggested that the doctrine is not so limited as Kable argues). By doing the portions of the Local 91–P work which Kable itself was not still doing, the secondary employers were helping Kable defeat the strike. They were not neutrals who had no interest in the primary dispute but instead "entangled [themselves] in the vortex of the primary dispute." *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 627, 87 S.Ct. at 1259. They, in Judge Learned Hand's words, "so far associated themselves with [the primary employer] in the controversy with its employees as to forfeit their privilege as neutrals." *NLRB v. Business Machine & Office Appliance Mechanics, Etc., supra,* 228 F.2d at 562 (concurring opinion).

The Board considered it relevant that Kable retained the contractual obligation to provide its customers with a complete product. Kable argues that this fact is "without any probative value" in determining whether the doctrine applies. In support of this contention, Kable points to cases involving the construction industry which hold that a subcontractor working at a common site with a struck primary is a neutral who may not be subjected to union pressure. See *NLRB v. Local 825, International Union of Operating Engineers,* 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). As Kable concedes, however, in none of these "common-situs" cases was the subcontractor doing work that had formerly been done by the striking employees of the primary. The subcontracting, arranged prior to the dispute, was not the result of the dispute or related to it in any other way. These cases therefore are of no assistance in determining the applicability of the ally doctrine here. *Cf. Carpet, Linoleum, Soft Tile & Resilient Floor Covering Layers, Local 419 v. NLRB, supra,* 139 U.S.App.D.C. 68, 429 F.2d at 751.

---

**6.** This was also recognized as the principle behind the common-law prohibition against secondary boycotts, a prohibition which this court, at least, limited to those secondary employers who were neutrals. See *Iron Molders' Union v. Allis-Chalmers Co.,* 166 F. 45, 51, 52 (7th Cir. 1908).

Moreover, even if we were to accept Kable's formulation of the controlling issue in this case as being whether *"but for* the strike, the work in question would be done by the striking employees," a relevant question would be whether the strikers' old jobs were still being performed under Kable supervision. The fact that Kable had become a general contractor with respect to that work, with full responsibility for the finished product, would not lack probative value on that question.

We need not decide, however, whether § 8(b)(4) could be invoked if Kable itself had not continued to do any of the struck work but had subcontracted it all out. That is not this case. Kable did continue to do some of the struck work and as to that work at least there was still a strike and a labor dispute; by doing the rest of the work formerly done by the strikers, the secondary employers knowingly assisted Kable in its effort to defeat the strike and became its allies. They were therefore not protected by § 8(b)(4).

## IV

■ We have considered the requirements that the basis we find for application of the ally doctrine be the one on which the Board relied, *cf. SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), and that the Board "adequately explicate" the basis for its decision, *cf. NLRB v. J. Weingarten, Inc., supra,* 420 U.S. at 267, 95 S.Ct. 959, 43 L.Ed.2d 171, and we conclude that they are satisfied. It should first be noted that the Board did not reverse itself on the law in its supplemental decision on remand. In its initial decision, as we have seen, the Board appeared to rest its holding on its unwillingness to accept the Administrative Law Judge's finding that Kable in good faith irrevocably decided to discontinue its cylinder work and did so for business reasons and not as a stratagem. After our remand with directions to decide the stratagem issue according to proper standards of review, the Board majority accepted the ALJ's finding on that issue

but nevertheless held that the ally doctrine applied for reasons it had found unnecessary to rely upon in its earlier decision. *Cf. Carpet, Linoleum, Soft Tile & Resilient Floor Covering Layers, Local 419 v. NLRB,* 151 U.S.App.D.C. 338, 467 F.2d 392, 404 (1972). Second, Kable argues that the Board majority's decision on remand rests on broader grounds than we would rely on here. It is true that statements in that decision imply that the majority would have found the ally doctrine applicable even if Kable had in fact achieved the desired complete cessation of its rotogravure-processing operation, so long as Kable continued to furnish the complete product to its customers and the secondary employers performed the substitute services which enabled it to do so. The Board also explained, however, that regardless of Kable's good faith intent to quit entirely the struck part of its business, it had not succeeded, because it not only remained responsible to its customers for a finished product, under contracts which encompassed all phases of the work, including cylinder processing, but was still itself doing part of the struck work. The Board's holding that, under these circumstances, a labor dispute continued and the secondary employers were allies of Kable in that dispute decided only the issue raised by the facts of the case. That holding may properly be viewed as resting on the same ground on which we base our judgment.

■ We may wish that the majority of the Board panel had seen fit to discuss the two Board cases between which the instant case seems to fall, *Brewery Workers Union No. 8 (Bert P. Williams, Inc.),* 148 N.L.R.B. 728 (1964), and *District 65, Distributive Workers of America (S.N.S. Distributing Service),* 211 N.L.R.B. No. 62 (1974). That the Board's "path may reasonably be discerned" is enough, however. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

It is perhaps unnecessary to say that we make no judgment on the merits, economic or otherwise, of the dispute between Kable and Local 91–P members that culminated in

the strike and do not question that Kable had the right to discontinue, permanently or temporarily, the department in which the striking employees had worked and to subcontract to others part or all of the work they had done, just as it had the right to engage other persons to come into the plant and do part or all of that work. This case involves only the question of whether the unions' countermeasures were prohibited by § 8(b)(4). We hold that they were not.

REVIEW DENIED.