## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## HENRY COLDER COMPANY, INCORPORATED, doing business as Colders Furniture, Respondent.

### No. 89–2358.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1990.

Decided July 25, 1990.

---

Aileen A. Armstrong, John D. Burgoyne, Robert F. Mace, N.L.R.B. Appellate Court, Enforcement Litigation, Washington, D.C., Joseph A. Szabo, N.L.R.B., Milwaukee, Wis., for petitioner.

Robert Felker, West Allis, Wis., for respondent.

Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

The Henry Colder Company ("Colders"), a Wisconsin furniture and appliance retailer, fired furniture salesman Steven Wasechek in November 1987. Colders says that it dismissed Wasechek because of his "abusive behavior"; Wasechek responds that, in fact, he was fired for engaging in protected concerted activity in violation of the National Labor Relations Act (the "NLRA" or the "Act"). An administrative law judge and a panel of the National Labor Relations Board (the "NLRB" or the "Board") agreed with Wasechek and ordered Colders to reinstate him with full backpay. The Board now applies to this court for enforcement of its order; we grant the Board's application.

I.

Steven Wasechek became a salesman at Colders in September 1985. In the two years before his discharge, he earned at least $40,000 in commissions each year. He was ranked 7th in sales out of 35 salespeople at the time of his discharge and had never received any written warnings about his conduct.

Beginning in early 1987, Colders required its salespeople (who had been working nine and one-half hour days) to attend daily sales meetings at 9:45 a.m., fifteen minutes before the store opened. At one of these meetings in October 1987, newly appointed Manager James Wilke announced that the meetings thereafter would begin at 9:30 a.m. Wilke's announcement led to substantial discontent among the Colders sales force. Salesman Wasechek was, in the view of the administrative law judge, "the most outspoken" critic of the new starting time. ALJ Decision at 1 (Aug. 18, 1988). He complained that the new starting time would lengthen the sales staff's hours and urged Wilke not to make the change. His concerns prompted other salespeople to complain, as Wasechek testified:

> A number of other people were speaking up. In fact, the more I spoke up, the more other people would speak up along.... I was speaking up leading this discussion with Mr. Wilke and then others were pitching in, putting in their points on how they felt about the situation. There was so much coming out that he [Wilke] became upset and kind of shut me down and pointed the finger at me.

Transcript at 120 (May 4, 1988). Later that month, Wilke announced that the salespeople would have to attend a 9 a.m. training meeting with representatives from May & Company on November 4. (The company previously had conducted such meetings later in the day during regular store hours.) Again, Wasechek was outspoken in his criticism of the new policy.

After the salespeople attended the 9 a.m. training meeting, they discovered copies of a memorandum written by Vice President

Robert Felker in their lunchroom mailboxes. The memorandum announced that the sales staff would have to arrive even earlier—at 8 a.m. for one of two special meetings—without compensation for the additional two hours worked before the store opened. Many salespeople were furious with the continuous extension of (unpaid) hours; at least one of those present said, "Somebody has got to do something about this." *Id.* at 136.

Wasechek, who was not scheduled to work on either special meeting day but would nonetheless have to attend one of the meetings, approached Wilke with the memorandum. Wilke escorted Wasechek, who was being followed by other salespeople, to Felker's office; when they reached the office, the following colloquy took place, as reported by Wasechek:

> Mr. Wilke said to me, "Are you sure you want to go through with this?" I said, "We just want to know why this has got to be this way." He said, "Well, then maybe you shouldn't work here then, Steve, if that is the way you feel." I said, "Are you threatening to fire me?" And he didn't respond.

*Id.* at 139. After he discussed the special meeting with Felker, Wasechek left the office where approximately ten salespeople had gathered to complain to Wilke about the early starting time.

Later that same evening, Wilke summoned Wasechek to his office and told him that he was fired. Wasechek described the scene:

> "Sorry Steve, we got to let you go. Nothing personal." I said, "What do you mean, you got to let me go? What are you talking about?" And he said, "Sorry, you are terminated." I said, "Why am I being terminated?" And he said, "You didn't punch out for lunch, did you?" I said, "No, I didn't. A lot of people don't." He said, "Sorry, Steve, that is the way it is."

*Id.* at 143.

## II.

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157 (1982). These rights are supported by Section 8 of the Act, which makes it an unfair labor practice "for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [Section 7] of this title." 29 U.S.C. § 158(a)(1) (1982).

In this case, the administrative law judge found (and the Board agreed) that Colders committed an unfair labor practice by discharging Wasechek for engaging in activity protected by the Act. Our review of this decision is limited; we must uphold findings made by the Board that are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (1982); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *Blackhawk Engraving Co. v. NLRB*, 540 F.2d 1296, 1300 (7th Cir.1976).

■ While acknowledging this standard, Colders challenges the Board's findings, arguing that Wasechek did not engage in activity protected by the Act. Colders asserts that Wasechek cannot claim the protections of Sections 7 and 8 because first, he did not assume a leadership role in voicing his complaints, and second, his complaints to Colders's management were personal and not made on behalf of his coworkers. Neither of these assertions has merit. Even a cursory review of the record reveals that Wasechek adopted a leading role in criticizing the new policies. The record suggests that while many employees grumbled about the early meetings, few spoke directly to Wilke about them. In addition, Wasechek seems to be the only salesperson who consistently voiced the group's concerns at the meetings. Finally, when one of his colleagues complained that "[s]omebody has got to do something about this," Wasechek brought the group's complaints directly to Felker while approxi-

mately ten salespeople congregated outside Felker's office.

Moreover, Wasechek's complaints to Wilke were not merely personal; he made them consistently on behalf of his fellow employees. Wasechek repeatedly used the pronoun "we" in articulating his objections: at the first meeting, "I specifically asked Mr. Wilke why *we* had to come in 15 minutes earlier than *we* were doing in the past.... Then I asked him what about the responsibilities *we* have and the long hours *we* are working ... and why this change [was necessary], when what *we* were doing in the past was working fine," Transcript at 118–19 (emphasis supplied); at the second meeting, "I started asking Mr. Wilke what about our personal responsibilities and the long hours *we* were working, and the strain that this is putting on *us*. And for what reason did *we* have to have it at 9 in the morning when the other system had worked very effectively," *id.* at 124 (emphasis supplied); and before entering Felker's office, "*We* just want to know why this has got to be this way.... Why do *we* have to have this meeting?" *Id.* at 139, 39, 58 (emphasis supplied). Admittedly, Wasechek expressed some personal objections to the new system—stemming from his obligation to babysit on the days of the special presentation—but these in no way undermine the fact that he directed his complaints primarily on behalf of the sales force.

Hence, there is substantial evidence in the record that Wasechek brought a group complaint about the timing of training sessions to the attention of Colders's management. He acted on behalf of his colleagues, many of whom eventually echoed his complaints directly to Wilke outside Felker's office. ALJ Decision at 6. From this evidence, the ALJ and the Board concluded that Wasechek's complaints constituted protected "concerted" activity under Section 7, and we agree. Section 7 of the Act protects the concerted activity of an individual even when he acts alone, so long as he intends to induce group activity or acts as another employee's representative. *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 831, 104 S.Ct. 1505, 1511, 79

L.Ed.2d 839 (1984); *see Pelton Casteel, Inc. v. NLRB*, 627 F.2d 23, 28 (7th Cir. 1980); *Indiana Gear Works v. NLRB*, 371 F.2d 273, 276 (7th Cir.1967). The Board's determination in this regard is well-supported by the facts and we will not disturb it here. *See, e.g., Roadmaster Corp. v. NLRB*, 874 F.2d 448, 452 (7th Cir.1989) ("Our court will uphold the Board's determination [regarding concerted activity] so long as it is not illogical or arbitrary."); *NLRB v. Parr Lance Ambulance Serv.*, 723 F.2d 575, 577 (7th Cir.1983) ("We will not reposition a line drawn by the Board between protected and unprotected behavior unless the Board's line is illogical or arbitrary.") (citations and quotations omitted).

■ Colders responds by arguing that even if Wasechek engaged in Section 7 activities protected by the Act, Felker could not have violated Section 8 because "the record does not contain evidence which would support the necessary finding that Felker knew of the concerted nature of Wasechek's complaints." Respondent's Brief at 16. The ALJ absolutely rejected this contention and challenged Felker's credibility in making it at the hearing, ALJ Decision at 6–7: such credibility determinations are properly within the province of the ALJ. *Roadmaster Corp.*, 874 F.2d at 453 n. 4. In any event, our review of the record demonstrates that Colders's argument is meritless. Felker discharged Wasechek only a few hours after Wasechek (with a group of salespeople in tow) came to his office to complain about the new starting times. And Felker discussed the discharge with Wilke—who admitted that he was well aware of Wasechek's protests—before ordering Wilke to fire him. Even without resorting to principles of imputed corporate knowledge, *Grand Rapids Die Casting Corp. v. NLRB*, 831 F.2d 112, 117 (6th Cir.1987), there is ample evidence to support a Section 8 violation here.

■ Colders's last line of defense is that Wasechek's activity, although concerted, was not protected under Section 7 because of its abusive nature. Of course, not

all concerted activity is protected; it is well-settled that "[a]n employee may engage in concerted activity in such an abusive manner that he loses the protection of § 7." *City Disposal Systems*, 465 U.S. at 837, 104 S.Ct. at 1514. Colders claims that (1) Wasechek's confrontation with a customer, (2) his insubordination at a training meeting and (3) his "loud and abusive" conduct on the sales floor led to his dismissal. Essentially, Colders argues here that it would have discharged Wasechek for these three instances of abusive behavior even if he had not engaged in concerted activities. If it could make this showing, Colders would satisfy its burden under *Wright Line* of demonstrating that its discharge was lawful because the discharge would have occurred regardless of its employee's concerted activities. *See NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (upholding *Wright Line*'s allocation of burden of proof); *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982) (explaining burden of proof and pretext).

The ALJ and the Board determined that Colders did not make this showing; they concluded that the General Counsel satisfied its burden of proving that Wasechek's protected conduct—not these three "pretexts"—was the "substantial or motivating factor" in the discharge, and we agree. *See Transportation Management Corp.*, 462 U.S. at 400, 103 S.Ct. at 2473. It is instructive that Wasechek did not receive written warnings or reprimands for these alleged abuses; instead, approximately two weeks before the discharge, Wilke told Wasechek that he had been "a very good employee" and "a very good producer." Transcript at 145.

More galling, however, is the fact that Wilke *initially claimed* that Colders fired Wasechek not for these three reasons, but because Wasechek did not punch out for lunch. Wasechek recounted his conversation with Wilke:

"Sorry Steve, we got to let you go. Nothing personal." I said, "What do you mean, you got to let me go? What are you talking about?" And he said, "Sorry, you are terminated." I said, "Why am I being terminated?" And he said, "You didn't punch out for lunch, did you?" I said, "No, I didn't. A lot of people don't." He said, "Sorry, Steve, that is the way it is."

*Id.* at 143. At the hearing, Wilke testified that Felker had said to him, a few hours before the discharge, "we were going to have to let Steve go that night ... [giving as a reason] [t]hat Steve had left that day and not punched out and not punched back in." *Id.* at 52–53. Shifting explanations for discharge may, in and of themselves, provide evidence of unlawful motivation. *See, e.g., NLRB v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1268 (7th Cir. 1987); *NLRB v. Rain–Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir.1984). Here they seriously undermine Colders's attempts to portray its discharge decision as based upon anything other than Wasechek's protected behavior.

### III.

Colders fired one of its successful salespeople, Steven Wasechek, for engaging in concerted activities to improve the working conditions for himself and for his colleagues. The decisions of the ALJ and the Board, both of which concluded that this discharge amounted to an unfair labor practice in violation of Sections 7 and 8 of the Act, are adequately supported by the record and by the law of this circuit. We therefore grant the Board's application for enforcement of its order.

Enforcement Granted.